## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN ROE,
an individual

Plaintiff,                                          Case No.

     v.                                          HON.

SEETHA MONRAD, ERIN
MCKEAN, and JANE/JOHN DOES
1-13, *in their individual and official
capacities*, JANE/JOHN DOES 14-18,
*in their official capacities*,

    Defendants.
_____

Sarah S. Prescott (P70510)
David L. Fegley (P85275)
SALVATORE PRESCOTT
PORTER & PORTER
*Attorneys for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@sppplaw.com
fegley@sppplaw.com
_____

## COMPLAINT AND JURY DEMAND

    Plaintiff John Roe, through his attorneys, Salvatore Prescott Porter & Porter,

brings this Complaint and Jury Demand for violations of Procedural Due Process

under the 14th Amendment, Substantive Due Process under the 14th Amendment,

Equal Protection under the 14th Amendment, and First Amendment Freedom of Speech and Association.

## PRELIMINARY STATEMENT

1.      The University of Michigan ("UM") has been repeatedly sued and repeatedly admonished by U.S. Courts relating to its failures to afford students Due Process protections before ejecting them from their educational programs and derailing young lives.

2.      This action arises from that same toxic ethic. In this case, the University ejected Plaintiff, John Roe, from the University of Michigan Medical School and the MD portion of the Medical Scientist Training Program (MSTP), just months before Plaintiff was set to graduate from medical school.

3.      Contrary to constitutional provisions that have already been explicated by the Courts of Appeals specifically regarding UM's prior violations of students' rights, Defendants denied Plaintiff an opportunity to be heard when the University adjudicated his situation, causing mandatory removal from the medical school.

4.      Plaintiff had worked night and day for a decade to reach the moment when his life was derailed. A highly successful Harvard undergraduate, he was also a model student in good academic standing at UM at all times and was dismissed from medical school for looking up a friendly colleague's birthday in a part of an electronic file that the University treats as a private medical record.

2

5.     That information was equally available on the World Wide Web.

6.     Plaintiff did not access or misuse anyone's medical information. He was never provided notice, never interviewed, and never provided the chance to call or examine any witnesses or to even *hear what was being told* to the decisionmakers who sealed his fate. Indeed, to this day, he has no idea of their names, has never received any findings, and many of the individuals involved are sued here as Jane/John Does.

7.     As it has done before, the University further expressly *forbade* Plaintiff from contacting all potential witnesses, and likewise, dictated that the witnesses could not to speak to him, on information and belief.

8.     Several members of University of Michigan's faculty learned of this matter and provided letters of support for Plaintiff, including the Chair of the Faculty Senate, which is the legislative arm of the Faculty Congress authorized to make recommendations to the provost, chancellor, and Board of Regents.

9.     As the Faculty Senate Chair succinctly explained: "**The student was not afforded sufficient Due Process**. Due process requires that the procedures are applied evenhandedly, that interested parties have an opportunity for confrontation, cross-examination, and discovery, and that a decision be made based on these records so that individuals are not subjected to arbitrary exercises. In this case, there were multiple violations of due process . . ."

10. Plaintiff seeks injunctive relief reinstating him to the University of Michigan Medical School and MSTP programs, compensatory damages, punitive damages, an award of his reasonable attorney's fees, and costs in prosecuting this action pursuant to 42 U.S.C. § 1983.

## PARTIES, JURISDICTION, AND VENUE

11. Plaintiff John Roe is an individual who resides in Ann Arbor, Michigan.

12. Seetha Monrad is, and was at all times relevant, responsible for what occurred, as the Associate Dean for Medical Student Education at the University of Michigan Medical School. Dean Monrad is being sued in both her individual and official capacities.

13. Erin McKean is, and was at all times relevant, responsible for what occurred, as Assistant Dean for Student Services at the University of Michigan Medical School. Dean McKean is being sued in both her individual and official capacities.

14. Jane/John Does 1-13 are the as-of-yet-unknown individuals who served within the University of Michigan's Compliance Office, staffed the Michigan Medicine Privacy Violation Review Committee (PVRC), staffed the Medical School, reviewed Plaintiff's matter and ratified it, and/or were otherwise responsible for Plaintiff's removal from the medical school without the processes

4

and procedural protections identified below. Does 1-13 are being sued in both their individual and official capacities.

15.     Does 14-18 are the as-of-yet-unknown individuals other than Does 1-13 who have the power and authority to reinstate Plaintiff and/or to operationalize other such injunctive relief as the Court may order. They are sued in their official capacities.

16.     All Defendants are, and were at all relevant times, employees of the University of Michigan, a public educational institution and an arm of the State of Michigan.

17.     Michigan Medicine is the University of Michigan's academic medical center.

18.     At all relevant times, individual Defendants were acting under color of law and within the scope of their employment.

19.     This Court has original subject-matter jurisdiction over this complaint pursuant to 28 U.S.C. § 1331.

20.     Venue is appropriate in this Court because the actions giving rise to this complaint occurred within the Eastern District of Michigan.

## GENERAL ALLEGATIONS

21.     Plaintiff restates and incorporates here all previously stated allegations.

5

22.     In Spring 2024, Plaintiff was a third-year MD/PhD Student at the University of Michigan Medical School.

23.     Plaintiff was a model student and a productive member of the medical school community. At no time was he ever in any jeopardy of any academic dismissal from medical school.

24.     At the time of these events, he had recently passed his National Board of Medical Examiners Step 1 and Step 2 exams.

25.     Plaintiff was an active member of the medical school's Gold Humanism Honor Society.

26.     He volunteered as a Peer Support Advocate and Crisis Text Line Counselor and was just months away from fulfilling his lifelong dream of completing medical school on his way to becoming a doctor.

27.     Plaintiff was also an employee of the University of Michigan Medical School Office of Medical School Education, where he worked as a tutor and intermediary.

**Plaintiff Accesses a Colleague's "Patient Station" to Learn Her Birthday**

28.     In 2024, as part of his PhD program, Plaintiff was working in a laboratory at Michigan Medicine with lab manager, Ms. E,[1] and other graduate students.

---

[1] Defendants directly or by their counsel are aware of Ms. E's full name.

29.     The atmosphere within the lab was friendly and informal, with lab members often commiserating and sharing personal stories with one another, both in-person and over a group text message thread.

30.     Occasionally, the topic of conversation concerned birthdays and astrological signs.

31.     The banter about birthdays and astrological signs in the lab was playful and lighthearted. At all times, Plaintiff and Ms. E had a friendly and positive relationship.

32.     Ms. E had (perhaps seriously or not) implied that her birth date could be found in her online records.

33.     MiChart is Michigan Medicine's medical records database.

34.     Current and active medical students have access to MiChart so they can complete clinical and/or research duties.

35.     At times relevant, Plaintiff's access to MiChart was slightly different. It had been granted for research purposes. Plaintiff accessed HIPAA-protected medical information of patients on MiChart multiple times per week related to that research.

36.     As a result of this work, Plaintiff was familiar with the layout of data on MiChart.

37.    He understood that the initial landing page of any file contained only basic demographic information about an individual, including name and birthdate, and did not contain any medically sensitive information.

38.    This cover page is known as the "Patient Station."

39.    On or around May 27, 2024, Plaintiff looked up Ms. E's birth date on Patient Station.

40.    This same information was and remains fully available on numerous public directory websites, including, for instance, MyLife.Com, a free service providing details culled from publicly available databases.

41.    Plaintiff did not see, nor did he search for, Ms. E's health information or clinical charts.  His total time on the demographics page was seconds-long. The brief period of time that Plaintiff spent looking at Ms. E's patient portal, as well as the fact that he never ventured inside her medical record, is uncontested.

42.    Plaintiff accessed Ms. E's birthdate only so that he could acknowledge it and celebrate her—an action meant to be friendly.

43.    To date, Plaintiff has never shared the date to anyone but Ms. E.

44.    Ms. E is less than 45 years old; there is nothing unusual or embarrassing about her date of birth.

45.    For absence of doubt, Plaintiff has never disclosed to third parties or misused *any* medical information: not as to Ms. E and not as to anyone else.

8

46.     Plaintiff acted under the impression that accessing such socially public information from *outside* the medical file itself did not constitute a violation of any privacy policies, having heard from more senior faculty and colleagues that **this was common practice**.

47.     Medical students and physicians in general are broadly unaware that information on the Patient Station is HIPAA-protected, irrespective of how the University treats it.

48.     Indeed, Plaintiff had routinely witnessed fellow medical students and/or physicians use the Patient Station for conveniences rather than medical need. Examples include a resident physician using the Patient Station to look up a co-resident's patient's room number (to find someone), or a medical student incorrectly typing in a patient name and then opening up various files and scrolling through many patients' demographic information without medical need, to avoid the inconvenience of finding the correct spelling.

49.     Plaintiff had nothing to gain and everything to lose from being seen as a person who invades others' private information, and he did not take medical privacy lightly or seek any gain from Ms. E or his actions.

50.     He simply misapprehended the notional separation between the Patient Station's demographics and the medically sensitive file itself.

51.    On information and belief, Ms. E never filed a complaint about the issue, despite Plaintiff sending her an email correctly identifying her birthday.

52.    Rather, a third-party supervisor of Ms. E's filed a report with Michigan Medicine's Compliance Office on the understanding that doing so was a job requirement.

**Plaintiff is Informed that he is to be Ejected from Medical School**

53.    About a month passed, and Plaintiff continued to have access to MiChart.

54.    Plaintiff handled every item of medical information he accessed with complete confidentiality, and no one ever asserted anything to the contrary.

55.    On June 28, 2024, Defendant McKean emailed Plaintiff and told him that she needed to speak with him urgently.

56.    Plaintiff called Defendant McKean, who informed him that he had been identified as having committed a serious disciplinary violation. She did not explicitly state what the issue was.

57.    Plaintiff had no idea what Defendant McKean was referring to until she mentioned that the alleged misconduct involved a lab manager; Plaintiff assumed this call was about Ms. E.

58.    As noted, before, the Medical School has a process for providing written notice of charges with details necessary to formulate a response, and its

policies call for a hearing process to do that. The medical school is required to alert the student to a level of seriousness/jeopardy so that they are on notice of the potential consequences, and "egregious" matters require cross examination and other procedural protections. Likewise, the medical school has a written process for handling violations of HIPAA policies, identified in more detail below.

59.   None of that was discussed, nor did any of that occur between McKean and Plaintiff.   Plaintiff was not afforded meaningful notice or an opportunity to respond.

60.   What Dean McKean did do was expressly order Plaintiff not to discuss the matter with anyone who *was* or *might* be involved.

61.   Plaintiff followed up approximately one hour later with an email to Dean McKean asking if he "would be able to apologize to the person" whose privacy he was accused of violating.

62.   Dean McKean responded that he could not speak to anyone he thought could be involved.

63.   That same evening, Plaintiff received an email stating that the Michigan Medicine Compliance Office had "**suspended [his] access to MiChart permanently**." (emphasis added).   One or more of the Does, 1-13, and/or named Defendants made and announced this decision.

11

**On July 1, 2024, Defendants Announce Unappealable Level 4 Determination Equates to Expulsion**

64.    On July 1, 2024, Plaintiff met with Defendants Monrad and McKean, and Stephanie Chervin, an Academic Advisor at the medical school, to understand what was happening.

65.    They provided Plaintiff with a paper copy of Michigan Medicine Workforce Policy 01-04-390: "Discipline for Violations of Privacy or Security of Protected Health Information (PHI) or Other Sensitive Information for All Michigan Medicine Workforce."

66.    That lengthy document describes each tier of medical privacy violations, as follows.

67.    <u>Level 1: Accidental or inadvertent violation.</u> This level of violation occurs when a workforce member unintentionally or carelessly, due to inattentiveness, lack of understanding, or other human error, leaves confidential information susceptible to being overheard, accessed, used by or disclosed to unauthorized individuals.

68.    Per the policy, this lowest-level violation applies to unintentional/unknowing violations.

69.    Examples of this sort of violation may nevertheless result in third parties learning of others' sensitive, private medical facts. The examples include:

a.  Giving the wrong document (*e.g.*, After Visit Summary) to the wrong patient;

b.  Leaving medical records or a copy of personal health information (PHI) or other confidential information in a non-secure area;

c.  Mailing, faxing, or e-mailing error resulting in disclosure of PHI to the wrong person(s) (such as e-mailing a file that includes PHI to the wrong person outside Michigan Medicine, or faxing PHI to an incorrect fax number in error due to mistakenly typing the wrong number);

d.  Dictating or discussing PHI in a public area (*e.g.*, cafeteria, elevator) or without using reasonable safeguards (*e.g.*, speaking in a quiet voice);

e.  Improper disposal of PHI (*e.g.* failure to properly destroy, such as via shredding or failure to discard into locked confidential blue bin, contents of which are shredded);

f.  Not properly verifying individuals by phone, in person, or in writing before releasing PHI or other confidential information; inadvertent disclosure of PHI, such as inadvertently posting PHI on social media (*e.g.*, posting a picture without realizing PHI can be

13

seen in the background or accidental upload of a picture containing PHI).

70.    Level 2: Failure to follow established policies and/or procedures. This level of violation occurs when a workforce member fails to follow a privacy or information security procedure or policy, resulting in unauthorized access, use or disclosure of PHI.

71.    Per the policy, Level 2 violations involve failure to adhere to policy, with the provided examples again demonstrating that real harm may occur in disclosure of sensitive medical facts to unwanted third parties.

72.    Examples of Level 2 violations include, but are not limited to:

a. Releasing PHI to a caller about a patient who is designated as "No Information" status;

b. Failure to take reasonable precautions to prevent incidental disclosure of highly sensitive PHI, such as HIV status;

c. Failure to follow the minimum necessary standard (*e.g.*, releasing more information than applicable to a work-related injury to a workers compensation carrier, leaving detailed PHI in a voicemail, *etc.*);

d. Unauthorized negligent disclosure of PHI (*e.g.*, leaving papers containing PHI where family member or other unauthorized person can view the information);

e. Posting a picture or other information about a patient on a social media platform without written authorization, but where there is implied consent (*e.g.*, it is indisputable that patient was aware and agreed to the posting, patient "likes" the posting, *etc.*);

f. Failure to obtain a written agreement (*e.g.*, data use agreement or vendor contract with business associate agreement) prior to disclosure of PHI;

g. Failure to properly sign off a workstation or secure a computer leaving PHI exposed;

h. Repeated incidents of Level 1 violations.

73. Level 3: Deliberate or purposeful violation without harmful intent. This level of violation occurs when a workforce member intentionally accesses, uses, or discloses confidential information or systems for non-medical/business reasons. A reason may be for convenience, curiosity or concern for a patient(s), and this must be for reasons other than personal gain or malicious intent, and not rising to willful, blatant disregard (which would be designated as Level 4).

74.     In short, Level 3 violations involve a failure to follow a policy by someone who understands what they are doing (violating a rule) but without blatant disregard of rules and without intending harm or using the information for gain.

75.     Per the policy, examples of Level 3 violations include, but are not limited to:

    a.  Failure to properly sign off a workstation or secure a computer resulting in another person inappropriately accessing PHI under the employee's sign-on;

    b.  Sharing ID/password with another coworker or using another person's ID/password;

    c.  Accessing, tampering with or connecting to information systems that contain ePHI (*i.e.* computers, servers, routers, switches) without authorization;

    d.  Unauthorized, purposeful disclosure of PHI (*e.g.*, posting any comments about a patient (regardless whether the patient is actually named, but which can lead to the identity of the patient) on a social media platform such as Facebook);

    e.  Repeated incidents of Level 1 or Level 2 violations;

16

f. Situations that would otherwise constitute a Level 4 violation, except in the following circumstance:

    i. User's activity is limited to searching a single individual's name (*i.e.*, in the patient search field) who is known to the User, and

    ii. User acted out of concern for, at the request or benefit of, and/or in the best interest of the patient/individual, and User's activity does not fit the definition of Treatment, Payment or Healthcare Operations in Policy 01-04-300, Privacy and Security Concepts and Definitions (*e.g.*, User searched name to find inpatient unit/room number of individual who asked the User to come visit); and

    iii. None of the following factors are present:

        1. Inconsistency between the audit and the User's explanation/statement(s)/other information;

        2. Evidence that the User acted out of malicious intent or for personal use/personal gain;

        3. User's activity demonstrates a pattern of inappropriate behavior/use of the EMR system (*i.e.*, more than one occasion);

4. User's activity involves search(es) for the name of one or more High Profile Patient(s) or High Profile Individual(s), regardless of whether a Michigan Medicine patient record exists for such person(s);

5. User's activity involves searching one or more name(s) of individuals where there is evidence of a strained or estranged relationship with the individual(s), directly or indirectly;

6. User's activity involves access to the clinical tabs and/or other clinical sections (*e.g.*, Notes tab, encounters tab, snapshot, storyboard, etc.) of one or more patient record(s); and

7. User's activity involves attempt(s) to break the glass ("Bumped the Glass") and/or User broke the glass on one or more records for which "Break the Glass" ("BTG") is set.

76.    Notably, any of the above forms of errors/misconduct (Levels 1-3) allow for rehabilitation of the employee. Hence, gossiping about a patient in the elevator and discussing their sensitive medical conditions would be a recoverable Level 1 violation. And intentionally posting a comment on Facebook about a

18

patient's condition without permission would be a Level 3 violation from which the rulebreaker could recover and return to work.

77.   In Plaintiff's situation, however, some to-date unknown individual(s) (identified here to include some portion of Does 1-13) decided that Plaintiff's conduct rose to a Level 4 violation.

78.   Level 4 violations occur when a workforce member willfully and intentionally accesses, uses, or discloses confidential information with blatant disregard for the confidentiality or disclosure of large volume or extent of patient information.

79.   Such "blatant disregard" may be evidenced, according to University's policies, by access, use or disclosure of large volume or extent of patient information; access, use or disclosure for personal use or personal gain; access, use or disclosure that may cause patient or organizational harm or with malicious intent or failure to comply with information security safeguards that result in loss of availability, integrity, and confidentiality of systems or data.

80.   Per the policy, Level 4 violations include, but are not limited to:

   a. Compiling a mailing list for personal use or to be sold or for personal gain (financial or otherwise);

   b. Inappropriate use, tampering with or unauthorized destruction or disposal of patient information for personal gain, personal use or

malicious intent, or which constitutes a flagrant misuse of the workforce member's access privileges to the electronic systems containing patient information;

c. Purposefully posting a picture of a patient and/or obvious identifiable information about a patient onto a social media platform such as Facebook without patient's knowledge or express or implied consent. (*e.g.*, posting a picture of a patient's face, unique injury or description thereof, tattoo, *etc*.).

81.    Plaintiff swiftly inquired about why Does 1-13 designated his conduct as a Level 4 infraction and about the availability of an appeal process.

82.    Defendant Monrad responded that the medical school had no authority or power in this situation, and that the Level 4 determination about Plaintiff's infraction (*i.e.*, the decision of Does 1-13) was already established, permanent, and unappealable.

83.    Furthermore, Plaintiff was advised that the medical school would not learn any reasoning or hear any basis for the Does' Level 4 determination; it would instead adopt and implement this decision by deciding *how* Plaintiff would be expelled from medical school as a result (*i.e.,* with or without the window dressing of "voluntariness").

84.    In other words, Defendant Monrad announced on July 1, 2024, that—one way or another—Plaintiff's medical school career was over, based on the decision of the Does.

85.    It would be nearly a full month later, on or about July 30, that Medical School Deans relayed to Plaintiff for the first time that the complaint to the Does that had triggered the disciplinary process alleged that Ms. E had expressly denied giving Plaintiff consent to look up her birthday, and that this supposed explicit lack of consent had contributed directly to the Level 4 designation.

86.    In other words, Plaintiff was told that he was accused of talking with Ms. E about whether to look up her information on Patient Station, that she had said not to do so, and that he had done it anyway.

87.    This was not true, and Plaintiff could have stated as much had Defendants honored the University's obligations under the U.S. Constitution to provide basic Due Process.

**Plaintiff is Denied the Opportunity to Speak with the Does to Present His Case**

88.    Long before he ever learned about the misunderstanding about consent, on or about July 1, 2024, Plaintiff again expressed contrition and his hope that the Compliance Office would reconsider, with Plaintiff offering to re-take any training, coaching, or classes that the University may prescribe.

89.    The Compliance Office was not willing to meet with Plaintiff.

90.     In place of any meeting, a medical school Dean sent Plaintiff what appeared to be a pasted excerpt of an explanation from the Compliance Office, though the email did not specify who was providing this alleged justification, which failed to provide any evidence for or any findings by any of the Does.

91.     Dean Monrad and Senior Associate Dean Louito Edje of the UM Medical School formally terminated Plaintiff as a tutor and an intermediary, with a designated "restricted rehire" status across Michigan Medicine and the University of Michigan Campus, even though neither of his jobs required access to MiChart.

**Michigan Medicine Ignores its Own Policies in Adjudicating Allegations Against Plaintiff**

92.     As Plaintiff examined the policies at issue, he soon realized that the University's own rules had required that Michigan Medicine Compliance Office interview him prior to the determination of any Level 1-4. On information and belief this would have included some or all of the Does, 1-13.

93.     Specifically, the policy required "HR Business Partner and/or [Office of Clinical Affairs], in conjunction with appropriate leader(s) from the involved Workforce Member's department, [to] investigate the case further by interviewing the accused workforce member(s) and any other individuals that would be deemed appropriate, if not completed already."

94.     Policy 01-04-390 also required that the Compliance Office consider "[t]he relevant facts and circumstances," which include the "[n]ature of the

22

misconduct; the employee's past disciplinary record, if any; severity of the violation; frequency of the violation; whether the violation was deliberate or malicious; and the existence of any aggravating or mitigating factors."

95.    Moreover, Policy 01-04-390 requires that following investigation, "the Level [1-4] of Violation is determined by the Michigan Medicine Privacy Violation Review Committee (PVRC) in accordance with this policy." As noted above, this should have included some number of Does 1-13.

96.    Plaintiff pointed this out to the Defendant Deans, asking why these steps had not occurred.

97.    Defendant Monrad responded in writing that she could not explain any such procedural gap, because "[t]he determination of a privacy violation is outside the purview of the medical school" and that she was not "privy to the process compliance runs…."

98.    As will be seen below, this claim "evolved" repeatedly thereafter.

99.    In any event, the "investigation" conducted at Michigan Medicine—if any—never involved Plaintiff and certainly did not involve notice of the charges against him or any opportunity to explain "whether the violation was deliberate or malicious; and the existence of any aggravating or mitigating factors" per policy.

100.    Defendants, including Does 1-13, also simply dispensed with the PVRC meeting in Plaintiff's case.

**As Plaintiff Objects to Defendants' Treatment, Explanations Evolve**

101.    Plaintiff sent a follow-up written objection on July 15 directly to the Compliance Office urging reconsideration of the level designation of his infraction.

102.    Defendants and their agents, specifically including Does 1-13, ignored him.

103.    On July 23, Plaintiff met with Defendant McKean, who indicated that "Compliance" at his employer, Michigan Medicine (*i.e.*, including Does 1-13), considered the case against him closed, and therefore no one from that office would *ever* speak with Plaintiff, as they had not ever spoken to him at any time before then.

104.    Plaintiff was also told on July 23 that the University (by and through the Does 1-13) was deeming the June 28 phone call in which Plaintiff first learned about the allegations made against him from his school, via Dean McKean, to have been an "interview" on behalf of Michigan Medicine, his employer.

105.    In short, the University claimed to Plaintiff that Dean McKean had served—not as Plaintiff's Dean at his school from which he had been on leave—but instead on behalf of Michigan Medicine, as an "HR Business Partner." (Policy established that such a Business Partner was to conduct the Michigan Medicine investigation, see Para. 93.)

106.   At all times relevant, Defendant McKean held herself out to be acting in the role of an academic officer and advisor to Plaintiff as a student, not HR for his employer. Among other times she did this, the Dean had stated on July 3 that Michigan Medicine's processes were "outside….the medical school," and that she was "not privy" to them.

107.   In any case, this notion continued to "evolve" still more. The University's agents eventually told Plaintiff that, in fact, no Policy 01-04-390 interview with Plaintiff had been carried out at all.

**Dean Monrad and Unknown Does Order Committee to Dismiss Plaintiff from Medical School**

108.   The University of Michigan Medical School Bulletin of Policies and Procedures ("UMMS Bulletin") is an 87-page agreement distributed to all UM medical students.

109.   All medical students are held accountable to adhere to it, and likewise it identifies the return promises of the Medical School as to students' rights and privileges.

110.   Nowhere in the UMMS Bulletin is there any language that disclaims the existence of a contract formed by the Bulletin.

111.   On the contrary, the Bulletin repeats in multiple passages that the University "is committed" to the procedures therein "to assur[e] a safe and

supportive learning environment that reflects the Institution's value of professionalism."

112.  UM Deans referenced the Bulletin as controlling of the University's relationship with Plaintiff consistently in writing to him.

113.  Nevertheless, Defendants flouted the Bulletin's procedural protections for students many times over in Plaintiff's case.

114.  The UMMS Bulletin expressly states that, "Dismissal is permanent removal of a student …**by the [medical school's] Competency Committee** when **the Committee has determined** that a student has not met the Medical School's competency standards" and "**only the Competency Committee can take action to dismiss**" a student. (emphasis added).

115.  Moreover, this body known as the Competency Committee housed within the school was to consider "contextual factors that might influence academic performance or professional behavior" – giving "holistic" review of any allegation and potential for remediation.

116.  The Bulletin promises a very specific process related to "Breach of confidentiality/EHR,"[2] spelling out *exactly* what "will" occur in response to just such alleged improper access.  Among the steps, the University agreed that—

---

[2] EHR means Electronic Health Record.

a. alleged violations "submitted for individual student concerns are reviewed by the Assistant Dean for Student Affairs or designee. The person or entity filing the [allegation] describes the behavioral concern with sufficient specificity so that the Assistant Dean for Student Affairs or designee can determine next steps based on the description, which may include follow up conversations and/or review of the student's record."

b. From there, the Assistant Dean is required to send the allegation to "curricular deans (Assistant Dean for Early Medical Education, Assistant Dean for Clinical Medical Education) and the Medical School Counselor or Academic Advisor for review and relevant input."

c. After receiving such input, "[t]he Assistant Dean for Student Affairs will generate a written explanation of why the [allegation] is designated as Type 1, Type 2, or Type 3," referring to levels of seriousness (Type 1 being the most serious) within the medical school;

d. The Assistant Dean for Student Affairs, not Does outside the medical school, then decides "upon the need for further action,

which will include a face-to-face discussion and/or other form of communication with the student" about the issue;

e.  In all cases, "[t]he student will be contacted and receive a copy of the [reported allegation] and the written explanation of why [it] is designated as Type 1, Type 2, or Type 3";

f.  The Assistant Dean for Student Services is required to provide the medical school's Competency Committee with a copy of a written allegation with a written explanation; it is for the Competency Committee to decide whether to empanel a Hearing Committee;

g.  For any "egregious" issue, a "Hearing Committee" is used "to support [the Competency Committee's] **rigorous** **holistic** review" of the matter, including a host of procedural due process protections such as written notification of the allegations, the right to call and question witnesses, the right to see the evidence being presented, *etc*.;

h.  In all cases, the Competency Committee and no one else determines **remediation** possibilities, including **a plan for addressing the behavior**, such as the need for counselling.

117.  For "Allegations of Unprofessional Behavior," the UMMS Bulletin outlines a similarly robust process.

28

118.   That process includes the opportunity for the accused student to make their case before a Hearing Committee, and guarantees that the accused student "will receive all information that is made available to the Hearing Committee"; has the right to "submit a list of witnesses to present information relevant to the case to the Hearing Committee, and/or to be interviewed by the Hearing Committee"; may "make opening and closing statements to the Hearing Committee; [and] be present for all testimony."

119.   Plaintiff did not receive *any* of these promised procedural protections, even though these protections have been afforded to other students and promises that such protections would be afforded were maintained as binding and controlling at all times by the University in this matter.

120.   Instead, as noted above, he was advised of the dismissal on July 1 and Defendants made it perfectly clear there would be no further meaningful process.

121.   To paper the matter up, Defendant Monrad called for a Competency Committee meeting, but she issued a memorandum to it (on information and belief developed with other Doe Defendants) dictating that the Committee dismiss Plaintiff.

122.   Contrary to the established rule that Plaintiff could **only** be dismissed by the decision of the Committee, Dean Monrad "presented to Competency Committee – Odd (CC-O) for consideration…either dismissal from UMMS or [for

29

Roe] to be allowed to withdraw… If [Roe] declines the opportunity to withdraw, **his termination will proceed as a dismissal**." (emphasis added)

123.   While written policy stated **only** the Competency Committee could dismiss a student, she further ordered that the Committee "can't" do anything but rubber stamp the decision to dismiss.

124.   Her missive explicitly "**mandates termination,**" and reiterates the Committee could only "deliberate and vote on: Dismissal or The Opportunity to voluntarily and permanently withdraw…." (emphasis added)

125.   The determination that the Competency Committee had no power, jurisdiction, or ability to do anything other than dismiss Plaintiff from school (with or without the veneer of voluntariness) was reached by the Defendants named and to be named.

126.   Certainly nothing in writing at the medical school or in Michigan Medicine policy, including the binding UMMS Bulletin, contradicted the guarantees that the Committee alone could decide on whether remediation could succeed.

127.   Prior to the hearing, Plaintiff's counsel reached out to UM's General Counsel, explaining that Plaintiff needed the opportunity to review the evidence that had been relied upon by Does 1-13, since it was the position of the University that their decisions on or before July 1 were controlling.

30

128.   Despite Plaintiff's counsel's request, this requested information was not provided.

129.   On information and belief, the Competency Committee itself got no such information, *i.e.*, for its supposed "holistic" review.

130.   Plaintiff's counsel also requested before the sham hearing access to "whatever the Dean will present…any witness statements, a copy of all items to be supplied to the [Competency Committee] such as PowerPoint or 'evidence,' a copy of any policies that may be cited, and the full rules of operation of the C[ompetency] C[ommittee], the right to call and confront witnesses, as well as access to exculpatory evidence."

131.   This was pivotal to secure in advance of the "hearing," because Plaintiff had been ordered that he was forbidden from communicating with any potential witnesses to defend himself.

132.   To date, Plaintiff cannot determine what part of this request was granted, since one or more of the Does determined he was barred from attending most of his supposed "hearing."

133.   Plaintiff's request even for *access to the rules of procedure applicable to the Committee* was denied sub silento.

134.   Either a slate of "supplemental" rules and procedures exists and was not provided to Plaintiff, or the unknown Doe 1-18 handlers of the Competency Committee were simply dictating procedures without any basis in writing.

135.   For instance, Plaintiff was told he would have just five minutes to present at this "hearing."

136.   Then, shortly before the hearing, this supposed rule was abruptly reversed, upon the decision of the Doe Defendants, depriving Plaintiff of an opportunity to prepare for and take advantage of the additional time he was granted at the last minute.

**Sham "Hearing" Reaches Pre-Determined Conclusion**

137.   At the sham "hearing," the Defendants denied Plaintiff the opportunity to hear the *allegations* made against him.

138.   Defendants also denied Plaintiff the chance to hear *evidence* against him. To this day, he does not know what was communicated to those present.

139.   Defendants further denied Plaintiff the opportunity to even prepare by speaking to witnesses of his choosing, let alone calling any witnesses.

140.   Defendants further denied Plaintiff the opportunity to cross-examine any adverse witnesses, and on information and belief there was no first-hand witness who presented anything to the Committee at all.

141.   Plaintiff was asked zero questions, and Defendants further denied Plaintiff access to hear any reasoning or deliberation, despite his asking for that opportunity.

142.   No findings were ever provided to Plaintiff at any level—not by Michigan Medicine, and not by the medical school.

143.   The result reached in the Competency Committee was a foregone conclusion in any case; the decision to remove Plaintiff from medical school had been made and announced on July 1, 2024.

144.   The Committee did what it was told, and unanimously decided that *if* Plaintiff did not "voluntarily" withdraw within 5 days, his removal would proceed as a dismissal.

145.   Plaintiff inquired about filing an appeal, but was advised in writing that doing so would be futile: the scope of the appeal body, like the Competency Committee, "does not include reviewing/overturning the underlying violation of the Michigan Medicine privacy policy . . . [the] appeal scope is similarly limited to withdrawal vs. dismissal."

146.   In other words, the Competency Committee had already determined the most favorable outcome dictated to it by some or all of the Does and other Defendants, *i.e.*, by giving him the "opportunity" to "withdraw" "voluntarily" months *after* he had been told he was being dismissed. The unknown Does'

determination that the medical school had no authority but to dismiss him would govern the appeal, as it had the sham "hearing."

147.   Facing certain dismissal and a futile appeal no matter what he did, Plaintiff "withdrew" from the UM School of Medicine on September 13, 2024.

148.   That decision was not functionally his at all, and it was certainly not voluntary.

**149.**   If Plaintiff's expulsion had not been decided on July 1, it was "constructively" achieved thereafter based on the University's non-existent "investigation," its many failures to honor commitments made to all students in writing, various decisionmakers' insistence on hiding their identities, the pronouncements long before the Competency Committee met that he would be ejected from medical school, the dictation of a result that had no home in any agreement or notice or written policy and was contrary to the Bulletin, the denial of basic opportunities to hear claims against him and present facts, the zigging and zagging about what rules existed and applied right up to the days before his supposed "hearing," the rubber stamping of the dictate to dismiss Plaintiff unless he withdrew, and the pronouncement based on nothing in writing that an appeal was futile.  In short, Defendants created intolerable conditions that left Plaintiff no other choice. **Defendants Foreclose Career Opportunities for Plaintiff for Life**

150.   By and through the Defendants, the University—an arm of the State of Michigan—has permanently suspended Plaintiff from accessing MiChart, meaning that by the age of twenty-four, Plaintiff can *never in his life* obtain a host of medical (physician, nurse, physician assistant) and medical-adjacent (receptionist at a health clinic to medical billing, *etc.*) jobs statewide.

151.   Does 1-18 reached this conclusion and are responsible for it.

152.   Plaintiff could literally have been convicted of any number of ***crimes*** and have a future path to the opportunities denied to him forever in this instance.

153.   Defendants' conduct also entirely foreclosed Plaintiff's career path as a physician, not just in Michigan, but in the United States of America.

154.   To date, Plaintiff has reached out to over 50 medical schools, all of which have declined to consider a transfer, often expressing skepticism that any medical school would eject a student in excellent standing for the first time offense of looking up a friendly colleague's birthday.

155.   To reassure other medical schools and maximize his chances of mitigating the harm to him, Plaintiff requested that Defendant Monrad sign a letter that explained, in a brief, factual manner the precise conduct for which Plaintiff received his disciplinary infraction.

156.   UM's General Counsel replied that Defendant Monrad would not sign her name to what was done to Plaintiff here.

**Defendants Continue to Thwart Plaintiff as he Pivots to Focus on his PhD.**

157. Plaintiff had been admitted long before the events herein to the University of Michigan's PhD program.

158. His PhD was to be completed in a school that is distinct from the medical school.

159. When he was assessing whether to "withdraw" "voluntarily" it was pivotal to Plaintiff that his disciplinary history would *not* bar his PhD. He therefore sought and received multiple assurances of the Defendants that this was the case.

160. In fact, however, Plaintiff was terminated without explanation from his jobs as a tutor and intermediary, even though neither of those positions requires use of MiChart, because of the above events.

161. After Plaintiff withdrew from the medical school, multiple UM employees spread information concerning Plaintiff's private educational information.

162. Among these, Dr. Emad Abou-Arab disclosed details about Plaintiff's discipline to one of Plaintiff's fellow MD/PhD students.

163. Plaintiff asked him to refrain from doing so but, approximately one month later, Dr. Abou-Arab did so again.

164.   Likewise, another faculty member, Dr. Adam Baruch, who was Plaintiff's Doctoring Faculty and Coach (a supposedly confidential resource to Plaintiff at the medical school) disclosed details about Plaintiff's discipline to other students.

165.   Both Dr. Baruch and Dr. Abou-Arab have admitted to divulging Plaintiff's private educational information.

166.   Plaintiff has no illusions that these are the only two individuals who have done so; they are simply the first two to be caught, and they have had the decency to admit what they did.

167.   Against his best interest and wishes, news of Plaintiff's discipline spread to others via such channels, until it was common knowledge.

168.   The same University that ended Plaintiff's career over looking up Ms. E's birthday has taken no steps to discipline the students and faculty it knows has been involved in bandying about Plaintiff's federally protected educational information.

169.   Rather, time and again, the Defendants have directly and personally made it functionally impossible for Plaintiff to complete his PhD in even more direct ways.

170.   Among other things, the University placed Plaintiff on academic probation due to the above events, with no process or explanation.

171.   This started a clock for Plaintiff to find an academic advisor for his research.

172.   That would have been no issue: Plaintiff had lined up a paid Graduate Student Instructor (GSI) position, which would have made him highly appealing to faculty members seeking students for their labs; the tuition coverage from the GSI position would enable the faculty member to hire Plaintiff, who had a stellar academic record, for a small amount of money.

173.   However, the GSI job offer was revoked after a medical school dean interfered in the process by alerting the Chair of Plaintiff's department for his PhD work about the unrelated disciplinary proceedings concerning Plaintiff in the medical school, as described above.

174.   In Fall 2024, Plaintiff was in communication with another potential lab mentor.

175.   The two agreed to have Plaintiff start a research rotation with her, only to have the lab mentor abruptly do an about-face, writing that "[i]t's come to my attention that your pending disciplinary action is potentially quite extensive" and explaining that she was withdrawing the offer.

176.   Another professor willing, seemingly, to host Plaintiff's research thereafter announced to his lab that he was hiring Plaintiff, only to omit to file any paperwork affirming that.

177. Plaintiff has requested a leave to realign his studies and seek a path forward.

**Expulsion Was Wildly Disproportionate**

178. On information and belief, many individuals enrolled at UM's medical school and/or working at Michigan Medicine have been adjudicated guilty of far more serious breaches of rules and procedures, to the Defendants' knowledge, and have nonetheless been permitted to complete their medical school training and to graduate, including without limitation:

    a. individual(s) who have misappropriated or misused controlled substances;

    b. individual(s) who have cheated on tests;

    c. individual(s) who have been under the influence of performance-altering substances at the time of providing medical treatment;

    d. individual(s) who have engaged in sexual impropriety;

    e. individual(s) who have assaulted patients;

    f. individual(s) who have harmed patients in the course of policy violations;

g. individual(s) who have had inappropriate relationships with patients.

179. Moreover, the Defendants have permitted medical students and/or residents who committed more serious infractions than Plaintiff to remain medical students and/or residents and to remediate their harm rather than face suspension or expulsion in multiple recent incidents.

180. For example, one of Plaintiff's classmates improperly changed a child's wound dressing without supervision (despite being told to ask for supervision), leading to infection and a second surgical procedure.

181. Despite the error being reported, the student involved continued to have clinical privileges and remains on track to graduate.

182. One of Plaintiff's other classmates sexually assaulted a fellow student.

183. When the victimized student reported this to the Dean, the victim was urged not to report it further, as doing so would be bad for her reputation upon application to residency programs. The Dean simply encouraged the victim to avoid her perpetrator. UM is poised to graduate this reported assailant without investigation.

184. On information and belief, numerous individuals have been improperly granted MiChart file access in violation of internal access regulations. On information and belief, no one has been investigated or punished for this,

although it means individuals have accessed medically sensitive medical information without proper authorization.

185. On information and belief, other students and residents have been disciplined by the Defendants for arriving at work while inebriated, but without being punished with dismissal or expulsion.

186. On information and belief, a medical resident was recently investigated for and found to have had improper relationships with patients; he was still permitted to graduate.

187.   On information and belief, another resident was fired due to a Level 4 violation and then re-hired, in sharp contrast to Plaintiff, who was told there was no path for him to return to the program from which he was constructively expelled.

188. On information and belief, another medical student had to be reported on three separate occasions for inappropriate chart access before an investigation finally substantiated the allegations.

189. Conversing without privacy in hallways, elevators, cafeterias, and other public locations about patients and their care is *routine*.

190. Nevertheless, Plaintiff—whose privacy infraction involved looking solely at the birthdate of a friendly colleague and never using or distributing that

information—is experiencing permanent, life-changing consequences and the most severe punishment available to medical students.

## COUNT I
## FOURTEENTH AMENDMENT
### Procedural Due Process
### 42 U.S.C. § 1983

191.   Plaintiff hereby incorporates all preceding paragraphs.

192.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

193.   All Defendants in this case are state actors subject to the Fourteenth Amendment.

194.   42 U.S.C. § 1983 prohibits any person acting under color of state law from subjecting or causing any citizen of the United States to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States or its laws.

195.   In the event that such deprivation occurs, that person "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…."

42

196.   Plaintiff has a protected liberty interest in, *inter alia*, his good name, reputation, honor and integrity, of which he cannot be deprived without Due Process.

197.   Plaintiff also has a protected property interest in, *inter alia*, pursuing his medical school education as well as in future education and employment opportunities and liberty to pursue other opportunities that he cannot be deprived of without Due Process.

198.   Plaintiff enjoyed a state-created property right to continued enrollment at the University of Michigan Medical School.

199.   At all relevant times, these protected liberty and property interests were well-established rights, of which a reasonable public official would have known.

200.   Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing—in this case, life altering and permanent.

201.   The result reached here fundamentally forecloses the profession of Plaintiff's choice forever and radically alters his earning capacity.

202.   Defendants, by their acts and omissions described above, have deprived Plaintiff of his constitutionally protected property interests in his continued enrollment at the UM Medical School, his right to complete his medical

education, his right to be free from arbitrary dismissal, his right to obtain his license as a physician, and his right to future employment.

203.   The Defendants' departure from their own hearing rules resulted in a procedure which not only violated its promises to Plaintiff, but which impinged on his clearly established Due Process rights.

204.   Defendants disciplined and sanctioned Plaintiff, depriving him of his liberty and property interests, without affording him basic Due Process, including but not limited to notice of the allegations against him, an opportunity to be heard, and an opportunity to marshal a defense—all on or before July 1, 2025.

205.   Plaintiff was further barred from confronting, much less cross-examining, his accuser or other adverse witnesses and was not allowed to have a third party do so. Plaintiff was never provided with a list of witnesses, and it is unknown how any witness information was gathered or presented. Plaintiff was never provided with any witness statements.

206.   Defendants denied Plaintiff procedural Due Process when the Privacy Violation Review Committee, contrary to Policy 01-04-390, never actually met to discuss Plaintiff's case.

207.   To date, Plaintiff is unaware what body (let alone who comprised that body of Does 1-13) decided that his discipline would be expulsion with or without

the veneer of "voluntariness," as dictated to the Competency Committee. This deprived him of any chance to challenge any Doe for bias.

208.   Defendants denied Plaintiff procedural Due Process when some number of them barred Plaintiff from appealing the Level 4 violation determination, *i.e.*, making the adjudication that was controlling as to his matriculation at medical school and dictating that it could not be reviewed.

209.   Defendants denied Plaintiff procedural Due Process when some number of them, pursuant to unwritten, arbitrary rules, determined the Medical School Competency Committee would be simply a rubber stamp, with no power to consider any facts, hear any witnesses, know the evidence relied upon, or consider anything other than the punishment of dismissal.

210.   Defendants denied Plaintiff procedural Due Process when they barred him from contacting key witnesses who could have helped support his side of the story at that step.

211.   Defendants denied Plaintiff procedural Due Process when they refused Plaintiff's requests to disclose all the procedures and rules that governed the Does and the Medical School Competency Committee's decision-making.

212.   Defendants denied Plaintiff Procedural Due process when, over his request to attend the sham hearing, some number of them barred him from attending significant portions, including the presentation of claims against him,

presentation of evidence against him (if any), any explanation of the prior controlling determination from Does 1-13, and any description of the power of the Committee as to outcomes of the "hearing."

213.   Plaintiff could not meaningfully respond to whatever unknowns were presented outside his presence.

214.   The reputational injury that Defendants jointly inflicted upon Plaintiff involves a false claim that Plaintiff acted for his own personal benefit in accessing a colleague's birthday from the Patient Station, and University officials have voluntarily disseminated those findings to many individuals.

215.   Defendants jointly promulgated and/or carried out the acts and omissions, official policies, orders and directives described above intentionally and deliberately, with wanton and reckless disregard for the civil and constitutional rights, privileges and sensibilities of Plaintiff.

216.   At each turn, Plaintiff petitioned that the above steps *not* occur, and that he be afforded the procedural protections that were denied.

217.   As a direct and proximate result of the above actions and conduct, Plaintiff sustained tremendous damages, including without limitation, emotional distress; loss of educational and career opportunities; loss of economic earning capacity; profound damage to his reputation; economic injuries; and other direct and consequential damages.

218.   Defendants' joint actions as described herein amounted to a malicious, reckless, wantonly negligent, and/or deliberately indifferent course of conduct such that Plaintiff is entitled to an award of punitive damages.

219.   Plaintiff also seeks declaratory and injunctive relief declaring the disciplinary process to which he was subjected as unconstitutional and expunging or vacating all findings, sanctions, or other records created or resulting from the unconstitutional process, plus an injunction reinstating Plaintiff and enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating misconduct allegations.

## COUNT II
## FOURTEENTH AMENDMENT
### Substantive Due Process
### (Shocks the Conscience)
### 42 U.S.C. § 1983

220.   Plaintiff hereby incorporates all preceding paragraphs.

221.   Plaintiff had the well-established right under the Fourteenth Amendment to be free from conduct that shocks the conscience, offending the canons of decency and fairness that express time-tested notions of justice, as a reasonable public official would have known.

222.   In violation of this right, Defendants jointly engaged in egregious conduct by constructively expelling him and derailing his professional future in a

result that was wildly disproportionate compared to others with far more egregious histories, who were permitted to remediate.

223.    The gravity of the punishment is enhanced by the fact that Plaintiff was issued not a *temporary* suspension from accessing MiChart, but rather **a lifetime ban**, which massively diminishes his economic opportunity.

224.    Defendants promulgated and/or carried out the acts and omissions, official policies, orders, and directives described above intentionally and deliberately, with wanton and reckless disregard for the civil and constitutional rights, privileges and sensibilities of Plaintiff.

225.    Defendants' joint conduct constitutes a substantial departure from accepted disciplinary norms, to demonstrate that they did not actually exercise professional judgment in their handling of Plaintiff's disciplinary infraction and its aftermath. For example, the direction of Defendant Monrad in writing, quoted above, was that the sole body empowered to conduct a meaningful review must not do so.

226.    Defendants' actions were arbitrary and capricious.

227.    Defendants' conduct was so egregious as to shock the conscience.

228.    There exists no rational relationship between Plaintiff's actual conduct and the discipline imposed against him by Defendants: namely, his constructive expulsion and permanent, irredeemable termination of his public employment.

229.   Disciplinary norms do not allow University officials to adjudicate alleged wrongdoing without giving a student any notice of the allegations made against him, and without giving the student an opportunity to be heard through a formal interview and presentation of evidence.

230.   Norms do not allow such a monumental threshold determination about the severity of the infraction to be set in stone without any avenue for appeal whatsoever.

231.   Norms do not allow a police force to be used to intimidate the accused merely for contacting a witness to his situation (*see* First Amendment claim, below).

232.   As alleged above, Plaintiff's removal from medical school so far exceeds what has been accepted as appropriate practice by this same and other institutions for students who engage in sexual misconduct, mistreatment of patients, practicing medicine under the influence, and many more serious infractions as to shock the conscience.

233.   Plaintiff's lifetime ban from any one of thousands of jobs within the State of Michigan under the circumstances above so far exceeds what has been accepted as appropriate practice by this same institution for students who engage in more serious conduct as to shock the conscience.

234. As a direct and foreseeable consequence of these decisions, Defendants deprived Plaintiff of his rights under the Fourteenth Amendment to the United States Constitution, and thereby sustained damages, including, without limitation, emotional distress, loss of educational and other career opportunities, economic injuries and other direct and consequential damages.

**COUNT III**
**FOURTEENTH AMENDMENT**
**Equal Protection**
**42 U.S.C. § 1983**

235. Plaintiff hereby incorporates all preceding paragraphs.

236. Under the Fourteenth Amendment, Plaintiff has a well-established right as a public-school student to the equal protection of the law, of which a reasonable public official would have known.

237. 42 U.S.C. § 1983 provides a federal cause of action against any person who, acting under color of law, deprives another person of equal protection of the law.

238. Upon information and belief, similarly situated medical students accused of similar and/or more serious offenses were provided the opportunity to remediate, rather than face dismissal or forced withdrawal from the medical school. *See* Paras. 178-190.

239.   Defendants lacked any legitimate rational basis for imposing different punishments for the same or *much worse* offenses.

240.   For the reasons described in the preceding paragraphs and pursuant to 42 U.S.C. § 1983, Defendants violated Plaintiff's Fourteenth Amendment rights to equal protection by subjecting him to different terms and conditions of matriculation and by terminating his education.

241.   As a direct and foreseeable consequence of the Defendants' joint acts and omissions, Plaintiff was deprived of his rights under the Fourteenth Amendment to the United States Constitution, and thereby sustained damages, including, without limitation, emotional distress, loss of educational and other career opportunities, economic injuries and other direct and consequential damages.

**COUNT IV**
**FIRST AMENDMENT FREE SPEECH**
**42 U.S.C. § 1983**

242.   Plaintiff hereby incorporates all preceding paragraphs.

243.   At all relevant times, Plaintiff had a clearly established right to freedom of speech and association pursuant to the First Amendment of the United States Constitution, of which a reasonable public official would have known.

244.   Plaintiff's free speech rights included the right to speak with fellow students in a public university setting, including those whose testimony could be

critical to Plaintiff's ability to counter and refute the serious allegations for which he was under investigation.

245. The University of Michigan has a process for instituting narrowly-drawn no-contact orders, which is operationalized within a centralized office by trained professionals, according to written rules.

246. Those rules do not allow for generalized, vague, free-floating orders without identified parties and without an end date.

247. Those rules do not allow no-contact orders to be based on mere worry or concern about future contact, especially in cases where no actual crime or threat of criminal act has taken place.

248. Yet here, Defendants prohibited Plaintiff from engaging in protected speech with any number of unnamed witnesses, in violation of Plaintiff's First Amendment rights.

249. Moreover, they told Plaintiff not to associate with or communicate with witnesses *after* their investigation of Plaintiff was closed and the result had been delivered to him, i.e., by July 1, 2025.

250. Moreover, they did so in a casual email and phone call, giving no names or end date, and the directive was not made through the University office established to issue such orders.

251.   This amounted to a free-floating trap for Plaintiff and chilled his opportunity to mount any defense.

252.   Moreover, they did all of this without *any* underlying report of suspected violence or even the threat of violence of any sort.

253.   On information and belief, they also issued this dictate without any request of the individuals involved for no-contact.

254.   On information and belief, these same Defendants instructed the witnesses, who were acting within their employment, **not** to speak with Plaintiff. This further prevented Plaintiff from mounting a defense.

255.   Upon reaching out to *one* potential witness, *once*, in a polite email, Plaintiff faced retaliation in the form of a threatening phone call from the police telling him that he would face criminal prosecution if he did that again.

256.   On information and belief, Defendants were in communication with police regarding Plaintiff's outreach to the potential witness and instigated and sanctioned the threatening phone call.

257.   Police contact would deter a person of ordinary firmness from exercising First Amendment rights and would have a chilling effect on the exercise of First Amendment rights.

258.   The police contact constituted an adverse action and was motivated by Plaintiff's protected conduct of reaching out to a potential witness.

259.  The speech prohibited by Defendants would have neither substantially disrupted school activities nor impinged on the rights of other students. The person who Plaintiff sought to contact was Ms. E, who on information and belief is not even a student.

260.  Defendants lacked a sufficient reason for restricting Plaintiff's speech after they had completed their so-called "investigation," and where no violence or threat of any sort was ever alleged.

261.  Plaintiff did not pose any threat of harm to any witnesses, there was zero evidence ever of any such potential, and any goals of preserving campus safety (which are sometimes implicated in other contexts) were simply not implicated here.

262.  Defendants, acting under color of state law and in concert with one another, by their conduct in prohibiting Plaintiff from speaking with fellow students and witnesses, showed intentional, outrageous and reckless disregard for Plaintiff's constitutional rights.

263.  As a direct and foreseeable consequence of these policy decisions, Plaintiff was deprived of his rights under the First and Fourteenth Amendments to the United States Constitution, and thereby sustained damages, including, without limitation, emotional distress, loss of educational and other career opportunities, economic injuries and other direct and consequential damages.

**RELIEF REQUESTED**

Plaintiff requests all relief that is available to him in law and in equity, including:

    A.   **Legal Relief**:

        i.    Compensatory damages in whatever amount he is found to be entitled;

        ii.    Exemplary damages in whatever amount he is found to be entitled;

        iii.    Punitive damages in whatever amount he is found to be entitled; and,

        iv.    An award of interest, costs, reasonable attorney fees, and expert witness fees.

    B.   **Declaratory & Equitable Relief:**

        i.    Declaratory relief identifying Plaintiff's rights and the Defendants' violations of them;

        ii.    Removal from Plaintiff's files and records of all references to the allegations or investigation at issue, discipline or sanctions;

56

iii.      Reinstatement to the University of Michigan Medical School and Medical Scientist Training Program as a student in good standing;

iv.      An injunction out of this Court prohibiting any further acts of wrongdoing or retaliation against Plaintiff;

v.      An award of interest, costs and reasonable attorney fees; and,

vi.      Whatever other equitable relief appears appropriate at the time of final judgment.

Respectfully submitted,
SALVATORE PRESCOTT PORTER
& PORTER, PLLC

/s/Sarah Prescott

Sarah S. Prescott (P70510)
David L. Fegley (P85275)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com
fegley@spplawyers.com

Dated: February 7, 2025

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury in this matter.

/s/Sarah Prescott

Sarah S. Prescott (P70510)
David L. Fegley (P85275)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com
fegley@spplawyers.com

Dated: February 7, 2025